IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| A.M., A MINOR, BY HER PARENTS AND NEXT FRIEND, OPRAH COOPER, JR., F/K/A ODA HAKORIMANA | * | |
| | * | |
| | * | |
| Plaintiff, | * | Civil Action No. RDB-20-00287 |
| | * | |
| v. | * | |
| VIRGINIA COUNCIL OF CHURCHES, *et al.*, | * | |
| | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

This cases arises from an alleged incident which occurred on October 25, 2007 at a daycare facility in Hagerstown, Maryland. (ECF No. 10 at ¶ 12.) On that day, the Minor Plaintiff A.M., then a five-month old infant, allegedly suffered injuries to her neck, skull, brain, face, and eyes, as a result of actions of persons present at that facility. (*Id.* at ¶ 18, 19.) During the course of the last thirteen years, two previous lawsuits related to this matter have been dismissed. (ECF No. 14-2 at 2, 3.) A lawsuit filed in September of 2010 in the Circuit Court for Washington County, Maryland was dismissed for lack of prosecution. (*Id.* at 2.) In September of 2017, a Complaint was filed in the U.S. District Court for the Western District of Kentucky. (*Id.*) That case was dismissed for lack of personal jurisdiction. (*Id.* at 3.) Ultimately, this action was filed in February of 2020 (ECF No. 1), and the Amended Complaint was filed on May 1, 2020 (ECF No. 10).

Plaintiff, A.M., by her parent and next friend Oprah Cooper, Jr., F/K/A Oda Hakorimana has filed this action against Defendants Church World Service, Inc. ("CWS"), Virginia Council of Churches, Inc. ("VCC"), as well as two individual employees of VCC, Laura Abaandou and Mary Beth Alphin. (ECF No. 1.) The Amended Complaint (ECF No. 10) contains six counts: a claim against CWS and VCC for a violation of A.M.'s constitutional rights under 42 U.S.C. § 1983 (Count I); two claims for negligent supervision and training against CWS and VCC respectively (Counts II and III); two claims of vicarious liability for negligent acts committed by employees against CWS and VCC respectively (Counts IV and V); and a claim against CWS, VCC, Abaandou, and Alphin for negligence (Count VI). The Plaintiff seeks compensatory and punitive damages, reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1983, and other and further relief as may be just and proper under the circumstances, including but not limited to appropriate injunctive relief. (ECF No. 10.)

Presently pending are the Motion to Dismiss the Amended Complaint in its entirety filed by the Defendant Church World Service, Inc. (ECF No. 14) and the Partial Motion to Dismiss filed by Defendant Virginia Council of Churches, Inc. (ECF No. 19), seeking dismissal of the constitutional claims set forth in Count I. The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2018). For the reasons that follow, the Defendant CWS's Motion to Dismiss (ECF No. 14) is GRANTED and the Amended Complaint is DISMISSED WITH PREJUDICE as to CWS. The Defendant VCC's Partial Motion to Dismiss (ECF No. 19) is GRANTED, and the claim alleging violations of constitutional rights under 42 U.S.C. § 1983 is DISMISSED WITH PREJUDICE. Neither CWS nor VCC are state actors acting under color of state law for purposes of Section 1983.

This case shall proceed as a three-count complaint against the Defendants Virginia Council of Churches, Inc. ("VCC"), Laura Abaandou, and Mary Beth Alphin. Specifically, those three counts are failure to train and supervise against VCC (Count III), vicarious liability against VCC for the alleged negligence of employees Abaandou and Alphin (Count V), and negligence against the Defendants VCC, Abaandou, and Alphin (Count VI).[1]

## BACKGROUND

This Court accepts as true the facts alleged in the Plaintiff's Amended Complaint (ECF No. 10). *See Aziz v. Alcolac, Inc.*, 658 F.3d 388, 390 (4th Cir. 2011). Defendant Church World Service ("CWS") is a New York corporation (ECF No. 10. at ¶ 2.) CWS operates its Immigration and Refugee Program, which prepares the case files for all refugees in sub-Saharan Africa who are being considered for resettlement in the United States through a cooperative agreement with the Department of State/Bureau for Population, Refugees, and Migration. (*Id.*) Defendant Virginia Council of Churches, Inc. ("VCC") is a Virginia corporation and "local resettlement affiliate" of CWS. (*Id.* ¶ 1.) CWS receives funding for its Immigration and Refugee Program from the U.S. government, and CWS in turn provides some funding to its local affiliate, VCC. (*Id.* at ¶¶ 7, 8.) Specifically, VCC reported on its website that it received 17.53% of its 2006-2007 revenue from CWS. (*Id.*)

The Plaintiff A.M. was born in the United States, however, her mother and siblings are refugees from Tanzania, who were settled by CWS and VCC through CWS's Immigration and Refugee Program. (*Id.* at ¶ 5, 6.) This case arises out of an incident involving A.M. on October 25, 2007. (*Id.* at ¶ 12.) At this time, A.M. attended a daycare owned and operated by Jessica

---

[1] Answer of the Defendants VCC, Abaandou, and Alphin has been filed with respect to these counts. (*See* ECF No. 18.)

3

Rodriguez in Hagerstown, Maryland.  (*Id.* at ¶ 12.)  On the day in question, A.M. was under the care of both Rodriguez and her boyfriend, Randy Rosaio.  (*Id.* at ¶ 18.)  At some point during her stay with Rodriguez and Rosaio, A.M. suffered severe injuries to her neck, skull, brain, face, and eyes.  (*Id.*)  As a result, A.M. was diagnosed with "shaken baby syndrome" and has suffered from severe and permanent damage to her brain and body.  (*Id.* at ¶ 19.)  A.M. was five months old at the time of her injuries.  (*Id.* at ¶ 12.)  She will live in a permanent state of mental and physical impairment for the remainder of her life.  (*Id.* at ¶ 19.)

The Plaintiff claims that both CWS and VCC are at fault for this incident, as Abaandou, a VCC employee, referred A.M.'s mother to the daycare operated by Rodriguez, and VCC is a "local affiliate" of CWS.  (*Id.* at ¶ 13.)  Prior to referring A.M. to Rodriguez, Abaandou visited the daycare.  (*Id.* at ¶ 14.)  The Plaintiff claims that at the time of her visit, Abaandou was under a legal duty to ascertain whether the daycare was being operated in accordance with Maryland state laws, rules, and regulations.  (*Id.*)  According to the Amended Complaint, Abaandou admitted that she did not confirm whether the daycare had insurance in conformity with Maryland law and that she received no training or guidance from VCC as to how to properly conduct an onsite investigation of the daycare facility.  (*Id.* at ¶ 15, 16.)  The Plaintiff claims that VCC failed to properly train and supervise Abaandou to properly ascertain whether the daycare was insured pursuant to Maryland law prior to referring A.M. to said daycare.  (*Id.* at ¶ 20.)  The Plaintiff also claims that CWS failed to properly train and supervise VCC as a local resettlement affiliate to which it was providing direct financial support.  (*Id.*)  As an allegedly direct and proximate result of VCC and CWS's failures, A.M. has incurred substantial financial harm in the form of past medical expenses and will incur substantial future medical

4

expenses without the ability to seek legal redress against a homeowners liability policy of the Rodriguez daycare. (*Id.*)

A.M. now seeks damages under 42 U.S.C. § 1983 under Count I for violation of her constitutional rights under color of law against both CWS and VCC (Count I). (*Id.* at ¶ 22.) A.M. claims under Count II that CWS is directly liable for its negligent failure "to properly train and supervise VCC, as its local affiliate, with respect to evaluating and selecting childcare for refugees at facilities such as Rodriguez's daycare and, specifically, whether Rodriguez was in compliance with Maryland Code Annotated, Family Law Article § 5-570, *et seq.*, and Maryland Code Annotated, Insurance section, § 19-202 (as in effect 2007)." (*Id.* at ¶ 25.) A.M. claims under Count III that VCC is also directly liable for a negligent failure to properly train and supervise its employee and agent Laura Abaandou with respect to the same evaluation and selection procedures. (*Id.* at ¶ 28.) A.M. further claims under Count IV that CWS is vicariously liable for the negligent acts committed against her by VCC, as VCC was "CWS's local resettlement agent under its [Immigration and Refugee Program] and CWS funded 17.53% of VCC's 2006-2007 Revenue by VCC's own admission." (*Id.* at ¶ 31.) Similarly, A.M. claims that VCC is vicariously liable for the actions of Abaandou under Count V. (*Id.* at ¶ 34.) Finally, under Count VI, A.M. makes a general negligence claim, asserting that CWS and VCC, as well as VCC's agents and employees, "such as Laura Abaandou," owed A.M. a duty of care to prevent the financial harm she has suffered and will continue to suffer by "voluntarily becoming involved in the resettlement of refugees such as Plaintiff and her immediate family in the United States" and "assist[ing] such non-English speaking refugees [*sic*] finding medical care, health insurance, housing transportation, and childcare, *inter alia.*" (*Id.* at ¶¶ 37, 38.)

On May 15, 2020, Defendant CWS filed a Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 14), asking this Court to dismiss all the claims filed against it by A.M. pursuant to Fed. R. Civ. P. 8(a), 12(b)(6), and Maryland Code Annotated §§ 5-101 and 5-201. (ECF No. 14-1 at 1.) CWS argues that the Plaintiff's claims against it are time-barred, as well as that the Plaintiff has failed to plead sufficient facts to support the claims against CWS and/or she cannot recover under the asserted theories of liability. (*Id.* at 5.)

On June 17, 2020, Defendant VCC filed a Partial Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 19), asking this Court to dismiss only Count I, which alleges a violation of constitutional rights under 42 U.S.C. § 1983.

## STANDARD OF REVIEW

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). Rule 8(a)(2) provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Aschcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly*

expounded the pleading standard for 'all civil action' . . . ."); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). A plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. However, the rule demands more than bald accusations or mere speculation. *Id.*; *see also Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). To satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

## **ANALYSIS**

### A. The Plaintiff's Claims Are Not Time-Barred

A motion to dismiss pursuant to 12(b)(6) does not generally permit an analysis of potential defenses defendants may have to the asserted claims. However, dismissal may be appropriate when a meritorious affirmative defense is clear from the face of the complaint. *See Abbott v. Gordon*, No. DKC-09-0372, 2009 WL 2426052, at *4 (D. Md. Aug. 6, 2009) (citing *Biospherics, Inc. v. Forbes, Inc.*, 989 F. Supp. 748, 749 (D. Md. 1997), *aff'd*, 151 F.3d 180 (4th Cir. 1998)). "A complaint showing that the statute of limitations has run on the claim is the most common situation in which the affirmative defense appears on the face of the pleading," rendering dismissal appropriate. 5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357, at 352 (1990).

As the basis of this Court's jurisdiction lies in diversity of citizenship, under 28 U.S.C. § 1332(a), Maryland law applies. *Hartford Fire Ins. Co. v. Harleysville Mut. Ins. Co.*, 736 F.3d 255, 261 n.3 (4th Cir. 2013) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Therefore, the

applicable statute of limitations governing this dispute is the three-year statute of limitations for civil actions set forth in Md. Code. Ann., Cts. & Jud. Proc. § 5-101.  However, also relevant to this case is a tolling exception which provides:

> When a cause of action subject to limitation under Subtitle I of this title or Title 3, Subtitle 9 of this article accrues in favor of a minor or mental incompetent, that person shall file his action within the lesser of three years or the applicable period of limitations after the date of the disability is removed.

Md. Code Ann., Cts. & Jud. Proc. § 5-201.

When a disability is considered to be "removed" depends on type of disability in question.  Maryland courts have applied this tolling exception in the context of minors seeking to bring suit upon reaching majority, holding that the relevant statute of limitations period does not begin to run until the day preceding the individual's eighteenth birthday.  *See, e.g.*, *Mason v. Bd. of Educ. of Baltimore Cnty*, 795 A.2d 211 (Md. Ct. Spec. App. 2002), *aff'd* 826 A.2d 433 (Md. 2003).  With respect to mental incompetence, in *Kratz v. Medsource Cmty. Servs.*, 139 A.3d 1087, 1094-95 (Md. Ct. Spec. App. 2016), the Maryland Court of Special Appeals held that this tolling exception "preserves the legal rights of a mentally incompetent individual until a guardian is appointed; once a guardian is appointed, and gains the requisite knowledge to file a claim on the individual's behalf, the statute begins to run."  The *Kratz* court based its opinion on the policy considerations that led to the development of tolling exceptions, as well as the differences between the disability of infancy and the disability of mental incompetence.  *Id.* at 1092-95.

As the *Kratz* court explained, "[t]he tolling exceptions stem from the same line of reasoning that developed into the 'discovery rule' applicable to all civil litigants." 139 A.3d at 1092.  Under the discovery rule, to begin the running of a limitations period, it must be shown

8

that the plaintiff has "actual knowledge—that is, express cognition, or awareness implied from knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry." *Id.* (citing *Poffenberger v. Risser*, 431 A.2d 677, 681 (Md. 1981)). "The rule serves to 'distinguish between a blamelessly ignorant' plaintiff and one who has acted negligently and 'slumbered on his rights.'" *Id.* (citing *Doe v. Maskell*, 679 A.2d 394 (Md. 1994)). Consistent with this general principle, the *Kratz* court found that the tolling exception of § 5-201 serves to protect those who lack the mental capacity to comprehend and safeguard their legal rights. *Id.* at 1094. How this tolling exception does so with respect to minors and mentally incompetent individuals varies due to important distinctions between the two disabilities. The most relevant distinction to the case at hand is the nature of the relationships between individuals under these two different disabilities and their guardians.

For a minor, her guardian is by default her mother, "unless other arrangements have been made and approved by the court." *Id.* As such, "[t]he tolling exception applicable to minors is meant to protect children from a curtailment of their legal rights should a parent neglect to file suit within the typical statute of limitations." *Id.* (citing *Piselli v. 75th Street Medical*, 808 A.2d 508, 526 (Md. 2002)). The *Kratz* court concluded, "Rather than entrust the right to sue to a parent, who might lack the knowledge, experience, means, or plain enthusiasm to sue, the exception serves to save the legal action for the child to pursue, if he so chooses, once majority is gained." *Id.* In contrast, with respect to the guardian of a mentally incompetent adult, "the guardian must petition the court and satisfy the statutory requirements prior to appointment." *Id.* (internal citation omitted). The guardian of a mentally incompetent person "actively seeks to be an advocate" and, therefore, "the concerns expressed by the courts in

9

cases involving children and the statute of limitations are not as great where the guardianship is not imposed by operation of law." *Id.* In sum:

> A guardian has a right to bring suit on behalf of a mentally incompetent individual, as does a parent on behalf of a minor child, but imposing the statute of limitations on a guardian does not threaten the mentally incompetent adult's rights the way it would those of a child.

*Id.*

In this case the minor A.M. is represented by her mother as guardian. (*See* ECF No. 10.) A.M.'s mother is not alleged to have been appointed, but instead appears to have become A.M.'s representative for the purposes of taking legal action under operation of law. (*See* ECF No. 15 at 4.) A.M.'s mother is a refugee who does not read, write, or speak English. (*Id.*) The facts of this case simply do not resemble those described in *Kratz*. A.M.'s guardian did not actively petition the court to represent A.M.'s interests, nor was she required to meet any statutory requirements prior to her appointment. *See Kratz*, 139 A.3d at 1094. This Court notes that A.M.'s mother has been involved in the filing of two prior lawsuits in the search of the proper forum for claims on behalf of A.M. It cannot be said that "imposing the statute of limitations on a guardian does not threaten the mentally incompetent [individual]'s rights" in this case. *Id.* Therefore, neither of A.M.'s disabilities (infancy and mental incompetence) have been removed within the meaning of Maryland law, and the tolling exception provided in § 5-201 applies. The Plaintiff's claims are not time-barred.

### B. CWS and VCC Are Not State Actors

In Count I, brought pursuant to 42 U.S.C. § 1983, the Plaintiff alleges that both CWS and VCC violated her constitutional rights under color of state law, specifically by breach of the duties of both CWS and VCC to follow Maryland law and to have procedures in place to

Case 1:20-cv-00287-RDB   Document 23   Filed 11/13/20   Page 11 of 20

ensure its employees and selected service providers (like Rodriguez's daycare) also complied with Maryland law. (ECF No. 10 at ¶ 22.) In the Plaintiff's Response to VCC's Partial Motion to Dismiss, the Plaintiff claims that such breaches were violations of the Plaintiff's Fourth and Fourteenth Amendment right to be secure in her person. (ECF No. 20 at 5-6.) Both CWS and VCC argue in their Motions that the Plaintiff's claim under Count I fails because neither CWS nor VCC is a state actor, and neither Defendant was acting "under color of state law." (*See* ECF No. 14-2 at 17, ECF No. 19-1 at 2.)

Section 1983 of Title 42 of the United States Code provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See Filarsky v. Delia*, 556 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office,* 767 F.3d 379 (4th Cir. 2014), *cert denied sub nom*. However, Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Accordingly, a civil action under Section 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999); *see also West v. Atkins*, 487 U.S. 42, 49 (1998); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 928-30 (1982).

To state a claim for relief under Section 1983, a plaintiff must allege: (1) that the defendant "deprived [the plaintiff] of a right secured by the Constitution and laws of the United States;" and (2) that the defendant acted "under color of [a State] statute, ordinance,

regulation, custom, or usage." *Mentavlos v. Anderson*, 249 F. 3d 301, 310 (4th Cir. 2001) (citation and internal quotation marks omitted), *cert. denied*, 534 U.S. 952 (2001). The phrase "under color of state law" is an element that "is synonymous with the more familiar state-action requirement—and the analysis for each is identical." *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citing *Lugar*, 457 U.S. at 929). Thus, in order to successfully assert a claim under Section 1983 for the violation of constitutional rights, the defendant must be a state actor.

In other words, "the under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful.'" *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (quoting *Blum v. Yaretsky*, 457 U.S. 991 (1982)). The Bill of Rights is "a shield that protects private citizens from the excesses of government, rather than a sword that they may use to impose liability upon one another." *Holly v. Scott*, 434 F.3d 287, 292 (4th Cir. 2006), *cert. denied*, 547 U.S. 1168 (2006). As the U.S. Court of Appeals for the Fourth Circuit has held, "private activity will generally not be deemed 'state action' unless the state has so dominated such activity as to convert it to state action." *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 (4th Cir. 2009), *cert. denied*, 558 U.S. 1158 (2010). After examining the relevant facts and circumstances, the inquiry in each case alleging a violation of Section 1983 is whether the conduct is "fairly attributable" to the state. *Mentavlos*, 249 F.3d at 313. The question is whether "there is a sufficiently 'close nexus' between the challenged actions of [the defendant] and the State . . . such that their actions 'may be fairly treated as that of the State itself.'" *Id.* at 314, (quoting *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)).

In this case, the Plaintiff fails to advance a viable allegation as to state action for purposes of Section 1983. The Plaintiff's Amended Complaint describes CWS as a New York Corporation which operates an Immigration and Refugee Program through cooperative agreements with the Department of State/Bureau of Population, Refugees, and Migration. (ECF No. 10 at ¶ 2.) It describes VCC as a Virginia corporation and "a local resettlement affiliate" of CWS. (*Id.* at ¶ 1.) The Plaintiff contends that VCC, "as a local affiliate of CWS, received 17.53% of its 2006-2007 revenue from CWS," and that CWS itself received some "funding" from the U.S. government to operate its Immigration and Refugee Program. (*Id.* at ¶ 8.) The Plaintiff's claim that the actions associated with A.M.'s referral to Rodriguez's daycare are "fairly attributable" to the state is, therefore, based on the fact that (1) VCC employees took these actions as part of VCC's assistance to CWS in implementing its Immigrant and Refugee Program, which CWS runs through a cooperative agreement with the U.S. government, and (2) CWS receives some unspecified amount of funding for its program that may have indirectly passed through CWS to VCC.

The fact that CWS and VCC receive funds from the federal government does not transform either private entity into a state actor. The U.S. Supreme Court's opinions in *Blum v. Yaretsky*, 457 U.S. 991, 1010-11 (1982) and *Rendell-Baker v. Kohn*, 457 U.S. 830, 840 (1982) and the Fourth Circuit's opinion in *Mentavlos v. Anderson*, 249 F.3d 301, 319 (4th Cir. 2001) make clear that even when a private organization relies significantly on the State for funds, that dependence does not alone make the acts of the private organization acts of the State. However, the Plaintiff argues that the relationship between CWS and VCC and State is more substantial than the receipt of funds. The Plaintiff seeks to explain this relationship by

pointing to this Court's recent decision in *HIAS, Inc. v. Trump*, 415 F. Supp. 3d 669 (D. Md. 2020). (*See* ECF No. 15 at 5, ECF No. 20 at 2.)

In *HIAS*, this Court provided a history of resettlement in the United States in a case seeking a preliminary injunction against the Trump Administration brought by three faith-based "resettlement agencies," including CWS. *HIAS*, 415 F. Supp. 3d at 675-76. The Plaintiff points to this Court's descriptions of the relationship between the resettlement agencies and the U.S. government. This Court explained:

> [T]he Federal resettlement authorities and the Resettlement Agencies *have been directed to meet and consult with State and Local Governments* in order to establish policies and strategies for the placement and resettlement of the refugees, in the course of which, *acting in concert*, they are directed to take into account several factors . . . .

*Id.* at 675 (emphasis added). It is true that state action has been found "in circumstances where the private actor operates as a 'willful participant in joint activity with the State or its agents.'" *Mentavlos*, 249 F.3d at 311 (citing *Brentwood*, 531 U.S. at 296). However, this Court's dicta in *HIAS* is not dispositive of the issue presented in this case.

The Plaintiff simply does not allege facts in her Amended Complaint that suggest "there is a sufficiently 'close nexus' between the challenged actions of [CWS and VCC] and the State . . . such that [their] actions 'may be fairly treated as that of the State itself.'" *Mentavlos*, 249 at 314. In Count I of the Amended Complaint, Plaintiff alleges that CWS and VCC should have had procedures in place to verify insurance requirements and that VCC's employee, Abaandou, received no training or guidance on how to properly vet daycare facilities. (ECF No. 10 at ¶ 22.) There is no state involvement in Abaandou's training. The "general rule" for finding a "close nexus" is "that the governmental entity must play a role in the *specific decision*

that led to the deprivations complained of by an aggrieved person." *Philips*, 572 F.3d at 183 (emphasis added). The only allegations of any nexus between Abaandou's training and the State are that (1) VCC indirectly received funds from the U.S. government, and (2) there is some relationship between VCC and CWS, which operates an Immigration and Refugee Program through an agreement with the U.S. government. The Plaintiff cannot rely on the receipt of federal funds, nor this vague description of VCC's and CWS's relationship with the U.S. government to establish that CWS and VCC are state actors for purposes of a Section 1983 claim.

Further, the Plaintiff cannot rely on *HIAS* to provide a more detailed description of CWS and VCC's relationship to the U.S. government. No allegations in the Plaintiff's Amended Complaint suggest that VCC or CWS were "acting in concert" with the government when VCC conducted its allegedly deficient referral process for A.M. It is notable that the resettlement agencies in *HIAS* were seeking a preliminary injunction to prevent the implementation of an executive order that would effectively give "individual States and Local Governments veto power over resettlement." 415 F. Supp. 3d at 676. The agencies claimed that the legislative history of the Refugee Act confirmed that such veto power was unprecedented: the Act was "not intended to give States and localities any veto power over refugee placement decisions." *See* Complaint at ¶ 33, *HIAS*, 415 F. Supp. 3d 669 (No. 19-3346) (citing H.R. Rep. No. 99-132, at 19 (1985)). The Plaintiff's reliance upon the *HIAS* case is misplaced. Defendant CWS was arguing government control over its work was contrary to existing law. The alleged actions of CWS and its affiliates, including VCC, are clearly not so intertwined with the acts of the State that they ought to be considered acts of

the State itself. Quite simply, Plaintiff has not and cannot adequately allege state action in this matter, as required for a claim 42 U.S.C. § 1983. Count I of the Plaintiff's Amended Complaint fails to state a claim upon which relief can be granted.

### C. Counts II, IV, and VI Fail to State a Claim for Relief Against the Defendant Church World Service, Inc.

In Count II of the Amended Complaint, Plaintiff seeks damages for "financial harm" for an alleged failure to train. (ECF No. 10 at ¶ 25.) To support her failure to train claim, the Plaintiff alleges the following:

> CWS negligently failed to properly train and supervise VCC, as its local resettlement affiliate, with respect to evaluating and selecting childcare for refugees at facilities such as Rodriguez' daycare and, specifically, whether Rodriguez was in compliance with Maryland Code Annotated, Family Law Article § 5-570, *et seq.*, and Maryland Code Annotated, Insurance section, § 19-202 (as in effect 2007).

(ECF No. 10 at ¶ 25.) Plaintiff avers that "Plaintiff hereby adopts and re-alleges paragraphs 1 through 21 as and [*sic*] for paragraphs 1 through 21 of Count II as though fully set forth herein." (*Id.* at ¶ 24.) Paragraphs 1 through 18, which provide the factual basis for the Plaintiff's claims, only refer to conduct of Defendants VCC, Abaandou, and Alphin, as well as Rodriguez and Rosaio. (*Id.* at ¶¶ 1-18.) The Amended Complaint does not provide any factual allegations that CWS played a role in VCC's training of Abaandou or the events that led to A.M's alleged harm.

This Court has made clear that a plaintiff must provide factual allegations about the specific deficiencies in the defendant's training to state a failure to train claim. *See Johnson v. Baltimore Police Dept.*, 453 F. Supp. 3d 283, 309 (D. Md. 2020) (citing *McDowell v. Grimes*, No. GLR-17-3200, 2018 WL 3756727, at *4 (D. Md. Aug. 7, 2018)). Specifically, "[t]o state a

failure to train claim, the plaintiff must allege facts that reveal: '(1) the nature of the training, (2) that the training was a "deliberate or conscious" choice by the [defendant], and (3) that the [agent]'s conduct resulted from said training.'" *McDowell*, 2018 WL 3756727, at *4 (quoting *Jones v. Chapman*, No. ELH-14-2627, 2015 WL 4509871, at *12 (D. Md. July 24, 2015)). A plaintiff cannot rely on "broad, conclusory terms" or "bald assertions." *Id.* If "[r]ather than addressing the specific aspects of a training program," a complaint merely "alleges that the program led to violation of citizens' constitutional rights," such complaint fails to state a claim for relief. *Id.* The Plaintiff in this case has not alleged facts regarding a plan, custom, or practice with respect to any training that was provided by CWS, nor that CWS was required to provide such training. The Plaintiff has failed to state a plausible claim entitling her to relief under Count II.

Count IV also fails. Under Count IV, the Plaintiff adopts and re-alleges paragraphs 1 through 24 of her Amended Complaint and seeks relief under a theory of *respondeat superior*, claiming that "CWS is vicariously liable for negligent acts committed against the Plaintiff by VCC." (ECF No. 10 at ¶ 31.) The Plaintiff bases this theory of liability on the fact that "VCC was CWS' local resettlement affiliate under its [Immigrant and Refugee Program] and CWS funded 17.53% of VCC's 2006-2007 Revenue by VCC's own admission." (*Id.*) In other words, the Plaintiff claims that CWS is responsible for the acts of its agent VCC, which may be responsible for the acts of its employees Abaandou and Alphin. However, for purposes of vicarious liability, more than a mere agency relationship must be established. "It is important to distinguish between a servant and an agent who is not servant, because ordinarily a principal is not liable for the incidental acts of negligence in the performance of duties committed by

an agent who is not a servant." *Green v. H. & R. Block, Inc.*, 735 A.2d 1039, 1050 (Md. 1999). To establish that an agent is a servant, a plaintiff must generally show a certain level of control that the principal exerts over the agent, such as the ability to "control the details" and the "physical movements" of the agent. *Id.* at 1050-51. "The decisive test in determining whether the relation of master and servant exists is whether the employer has the right to control and direct the servant in the performance of his work and the manner in which the work is to be done." *Chevron, U.S.A., Inc. v. Lesch*, 570 A.2d 840, 844 (Md. 1990) (internal citations omitted).

The Plaintiff has not provided any facts to suggest that a master-servant relationship existed between CWS and VCC, let alone between CWS and VCC's employees Abaandou and Alphin. The facts set forth in paragraphs 1 through 18 of the Amended Complaint only refer to the conduct of Abaandou and Alphin. (ECF No. 10 at ¶¶ 1-18.) The sworn testimony attached to the Plaintiff's complaint similarly only discusses the actions of these two VCC employees. (*See* ECF No. 8-9.) This Court must consider whether the pleadings distinguish the allegations as to each defendant in deciding whether a short and plain statement has been asserted. *See Pumhoff v. Cent. Mortg. Co.*, 286 F. Supp. 3d 699, 703 (D. Md. 2017). The Plaintiff has simply failed to allege any facts suggesting that CWS controlled the actions of VCC and its employees in a manner that would allow this Court to find a master-servant relationship. The conclusory assertion of an agency relationship between CWS and VCC is insufficient. For this reason, Count IV fails to state a claim upon which relief can be granted under a theory of vicarious liability as against CWS.

For similar reasons, the Plaintiff fails to state a claim under Count VI as well. Under Count VI, the Plaintiff claims that "Defendants CWS and VCC and VCC's agent and

employee, Laura Abaandou, owed Plaintiff a duty of care to prevent the financial harm she has suffered and will continue to suffer." (ECF No. 10 at ¶ 37.) The Plaintiff claims that all Defendants undertook such duty "when voluntarily becoming involved in the resettlement of refugees such as Plaintiff and her immediate family." (*Id.* at ¶ 38.) The Plaintiff again, however, fails to distinguish the conduct of CWS from the other defendants. To prove negligence, a plaintiff must establish four elements: "(1) a duty owed by the defendant; (2) a breach of that duty by the defendant; (3) a legally cognizable causal relationship between the breach of duty and the harm suffered; and (4) damages." *McKinney v. Fulton Bank*, 776 F. Supp. 2d 97, 104-05 (D. Md. 2010) (citing *Jacques v. First Nat'l Bank of Md.*, 515 A.2d 756 (Md. 1986)). Without any factual allegations related to the conduct of CWS, the Plaintiff cannot establish these four elements. Count VI fails to state a claim for which relief can be granted.

## **CONCLUSION**

For the foregoing reasons, the Defendant CWS's Motion to Dismiss (ECF No. 14) is GRANTED and the Amended Complaint is DISMISSED WITH PREJUDICE as to CWS. The Defendant VCC's Partial Motion to Dismiss (ECF No. 19) is GRANTED and the claim alleging violations of constitutional rights under 42 U.S.C. § 1983 is DISMISSED WITH PREJUDICE. Neither CWS nor VCC are state actors acting under color of state law for purposes of Section 1983.

This case shall proceed as a three-count complaint against the Defendants Virginia Council of Churches, Inc. ("VCC"), Laura Abaandou, and Mary Beth Alphin. Specifically,

those three counts are failure to train and supervise against VCC (Count III), vicarious liability against VCC for the alleged negligence of employees Abaandou and Alphin (Count V), and negligence against the Defendants VCC, Abaandou, and Alphin (Count VI).

A Separate Order follows.

Dated: November 13, 2020

                                                                                                                /s/  
                                                                              Richard D. Bennett  
                                                                              United States District Judge